**REESE LLP**
Michael R. Reese
*mreese@reesellp.com*
George V. Granade
*ggranade@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

**HALUNEN LAW**
Melissa W. Wolchansky
*wolchansky@halunenlaw.com*
Amy E. Boyle
*boyle@halunenlaw.com*
Charles D. Moore
*moore@halunenlaw.com*
1650 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN NEWTON, *individually and on behalf of all others similarly situated*,<br><br>                    Plaintiff,<br><br>    – against –<br><br>KRAFT HEINZ FOODS COMPANY, and DAISY BRAND, LLC,<br><br>                    Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff John Newton ("Plaintiff"), individually and on behalf of all others similarly situated by and through his undersigned attorneys, brings this Class Action Complaint against Kraft Heinz Foods Company ("Kraft"), and Daisy Brand, LLC ("Daisy") (collectively, "Defendants"), and alleges as follows. Plaintiff bases his allegations on personal knowledge as to matters related to him and on information and belief as to all other matters, through the investigation of his counsel. Plaintiff believes substantial evidentiary support exists for the allegations set forth herein, and he seeks a reasonable opportunity for discovery.

## NATURE OF THE ACTION

**I.  DEFENDANTS DECEPTIVELY MARKETS THEIR SOUR CREAM PRODUCTS AS NATURAL, WHEN THEY ARE NOT**

1.  Plaintiff alleges that from May 1, 2011, to the date of class certification, Kraft and Daisy deceptively and misleadingly marketed, and continues to deceptively and misleadingly market, their brands of sour cream products (collectively "Products") as being Natural when, in fact, the   Products contain ingredients derived from unnatural genetically modified organisms ("GMOs").[1]

2.  With respect to Kraft, it sells its sour cream products at issue under the name Breakstone ("Breakstone Products").  The Breakstone Products include the following, all of which Kraft prominently labels as "Natural":

- Breakstone Sour Cream, 8 ounces;
- Breakstone Sour Cream, 16 ounces;
- Breakstone Sour Cream, 24 ounces; and
- Breakstone Sour Cream, 48 ounces

---

[1] As used herein, "genetically modified" refers to the use of molecular biology techniques, such as recombinant DNA techniques, to delete genes or to transfer genes for particular qualities from one species to another. In contrast to conventional breeding techniques, modern molecular biology techniques permit the insertion into an organism of genetic material from an unrelated species, such as the DNA of a fish into a tomato. *See* Ed Wallis, *Fish Genes into Tomatoes: How the World Regulates Genetically Modified Foods*, 80 N.D. L. Rev. 421 (2004).

(collectively, the "Breakstone Products").[2]

3.      With respect to Daisy, it sells its sour cream products under the brand name Daisy ("Daisy Products"). The Daisy Products include the following, all of which Daisy prominently labels as "Natural":

- Daisy Brand Sour Cream, 8 ounces;
- Daisy Brand Sour Cream, 16 ounces;
- Daisy Brand Sour Cream, 24 ounces;
- Daisy Brand Light Sour Cream, 8 ounces;
- Daisy Brand Light Sour Cream, 16 ounces; and
- Daisy Brand Light Sour Cream, 24 ounces

(collectively, the "Daisy Products").[3]

4.      During the period from May 1, 2011, to the date of class certification, Defendants systematically marketed and advertised their Products throughout the United States as "Natural" on the packaging itself, such that any consumer who purchased the Products, or who purchases the Products now or in the future, is exposed to "Natural" claim.

5.      Defendant's "Natural" claims are deceptive and misleading because the Products are not "Natural."

6.      All of the Products contain ingredients derived from genetically modified organisms, which are not natural. Specifically, all of the Products are produced from cream. On information and belief, the cows that produce the cream in the Products are fed GMO corn and/or GMO soy, which is not natural. Thus, the cream Defendants use to make the \Products is not "Natural," and the final

---

[2] Kraft may discontinue offering some sour cream products and regularly introduces new sour cream products that are also falsely and misleadingly labeled "All Natural." Kraft may also market and sell additional substantially similar sour cream products of which Plaintiff is unaware. Plaintiff will ascertain the identities of these additional products through discovery.

[3] Daisy may discontinue offering some sour cream products and regularly introduces new sour cream products that are also falsely and misleadingly labeled "Natural." Daisy may also market and sell additional substantially similar sour cream products of which Plaintiff is unaware. Plaintiff will ascertain the identities of these additional products through discovery.

Products are not "Natural."

7.    Indeed, as a result, the Products do not, and cannot, meet the standard for organic Products.  As explained by the USDA:

> The use of genetic engineering, or genetically modified organisms (GMOs), is prohibited in organic products. This means an organic farmer can't plant GMO seeds, ***an organic cow can't eat GMO alfalfa or corn,*** and an organic soup producer can't use any GMO ingredients. To meet the USDA organic regulations, farmers and processors must show they aren't using GMOs and that they are protecting their products from contact with prohibited substances, such as GMOs, from farm to table.[4]

8.    However, use of the term Natural to describe products that cannot meet the organic standard is misleading.  As concluded by Consumer Reports based on a survey conducted of 1000 person, consumers regularly interpret natural to mean that the product meets organic standards:

> "We've seen time and again that majority of consumers believe the 'natural' label means more than it does," says Urvashi Rangen, Ph.D., the director of the Consumer Reports Food Safety & Sustainability Center, "and by buying 'natural' foods, they may think they're getting the same benefits as organic..."

> [However], the term "natural" is organic's imposter. Consumers attribute all sorts of benefits to the term—no antibiotics, no artificial colors, no GMOs, no synthetic pesticides. Organic means all those things but "natural" does not. In fact, there is no standard definition for "natural" foods at all.[5]

9.    Defendants mislead, deceive, and confuse reasonable consumers, including Plaintiff and the Class members, by portraying the Products as "Natural" when they contain non-natural ingredients.

---

[4] http://blogs.usda.gov/2013/05/17/organic-101-can-gmos-be-used-in-organic-products/ (last visited August 17, 2016).

[5]    http://www.consumerreports.org/natural-foods/the-difference-between-labels-on-organic-and-natural-foods/ (last visited August 17, 2016).

10.     Defendants' conduct harms consumers by inducing them to purchase Products containing non-natural ingredients on the false premise that the Products are "Natural," when the consumers would not have otherwise purchased the Products and/or paid a premium price for the Products, had they known they were not in fact "Natural."

## PARTIES

### Plaintiff John Newton

11.     John Newton resides in Brooklyn, New York.

12.     During the period between May 1, 2011 and the present, Plaintiff purchased the Breakstone Products and the Daisy Products in Brooklyn for personal use.

13.     The packaging of the Breakstone's Products Plaintiff purchased contained the representation that they were "Natural."

14.     Similarly, the packaging of the Daisy Products Plaintiff purchased contained the representation that they were "Natural."

15.     Plaintiff read and believed Kraft's representations that the Breakstone Products were "Natural." He relied on the "Natural" representation in making his purchase decisions and would not have purchased the Breakstone Products had he known the Breakstone Products were not, in fact, "Natural" because they were derived from GMOs.

16.     Similarly, Plaintiff read and believed Daisy's representations that the Daisy Products were "Natural." He relied on the "Natural" representation in making his purchase decisions and would not have purchased the Daisy Products had he known the Daisy Products were not, in fact, "Natural" because they were derived from GMOs.

17.     Plaintiff paid for "Natural" Breakstone Products, but he received Breakstone Products that were not "Natural" because they contained non-natural ingredients derived from GMOs.

18.     Similarly, Plaintiff paid for "Natural" Daisy Products, but he received Daisy Products that were not "Natural" because they contained non-natural ingredients derived from GMOs.

19.     Plaintiff does not consider a sour cream product containing and/or derived from genetically modified ingredients to be "Natural."

20.     Had Kraft not made the false, misleading, and deceptive representation that the Breakstone Products were "Natural," Plaintiff would not have been willing to pay the same amount for the Breakstone Products, and, consequently, he would not have been willing to purchase the Breakstone Products. Plaintiff purchased, purchased more of, and/or paid more for, the Breakstone Products than he would have had he known the truth about the Breakstone Products.

21.     Similarly, had Daisy not made the false, misleading, and deceptive representation that the Daisy Products were "Natural," Plaintiff would not have been willing to pay the same amount for the Daisy Products, and, consequently, he would not have been willing to purchase the Daisy Products. Plaintiff purchased, purchased more of, and/or paid more for, the Daisy Products than he would have had he known the truth about the Daisy Products.

22.     The Breakstone Products Plaintiff received were worth less than the Breakstone Products for which he paid. Plaintiff was injured in fact and lost money as a result of Kraft's improper conduct.

23.     Similarly, the Daisy Products Plaintiff received were worth less than the Daisy Products for which he paid. Plaintiff was injured in fact and lost money as a result of Daisy's improper conduct.

24.     If Plaintiff knew the Breakstone Products were, in fact, "Natural," he would continue to purchase the Breakstone's Products in the future. At present, however, Plaintiff cannot be confident that the labeling of the Breakstone Products is, and will be, truthful and non-misleading.

25.     Similarly, if Plaintiff knew the Daisy Products were, in fact, "Natural," he would continue to purchase the Daisy Products in the future. At present, however, Plaintiff cannot be confident that the labeling of the Daisy Products is, and will be, truthful and non-misleading.

**Defendant Kraft Heinz Foods Company**

26.     Kraft Heinz Foods Company is a corporation organized under the laws of the Commonwealth of Pennsylvania.

27.     Kraft's principal place of business is located at One PPG Place, Suite 3200, Pittsburgh, Pennsylvania 15222.

**Defendant Daisy Brand, LLC**

28.     Daisy Brand, LLC, is a limited liability company organized under the laws of the State of Texas.

29.     Daisy's principal place of business is located at 12750 Merit Drive, Suite 600, Dallas, Texas 75251.

## JURISDICTION AND VENUE

**Jurisdiction**

30.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiff is a citizen of New York and Kraft is citizen of Pennsylvania, at least one member of the plaintiff class is a citizen of a State different

from one of the defendants. Further, Plaintiff alleges the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs. Finally, Plaintiff alleges "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

31.     This Court has personal jurisdiction over Defendants for reasons including but not limited to the following: Plaintiff's claims arise out of Defendants' conduct within the State of New York, including Kraft's conduct of disseminating in the State of New York false and misleading representations concerning the nature, quality, and/or ingredients of the Breakstone's Products and Daisy's conduct of disseminating in the State of New York false and misleading representations concerning the nature, quality, and/or ingredients of the Daisy Products.

### **Venue**

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District, including Plaintiff's purchases of the Products based on Defendants' dissemination of false and misleading information about the nature, quality, and/or ingredients of the products.

## FACTUAL ALLEGATIONS

**I.      DEFENDANTS ADVERTISE AND MARKET THE SOUR CREAM PRODUCTS AT ISSUE AS "ALL NATURAL" OR "NATURAL"**

33.      A consumer survey showed that nearly seven in ten consumers were "very" or "somewhat" interested in natural products.[6]

34.      In another consumer survey, "natural ingredients" ranked second only to "taste" in influencing consumer purchasing behavior.[7]

35.      Consumer desire for natural products and natural ingredients has translated into financial gain for food producers, as each year consumers purchase billions of dollars' worth of natural products. In 2010, U.S. consumers purchased $39 billion worth of natural/organic food products, up from $33.7 billion in 2009.[8] Defendants, like many food manufacturers, recognized the growing consumer desire for natural food products.

36.      To capitalize on consumers' rising demand for natural food, Kraft labels and markets the Breakstone Products as "All Natural," thereby setting the Breakstone Products apart from other competing sour cream products.

---

[6] Bruce Horovitz, *Frito-Lay Turns to Nature's Path*, USA TODAY, Dec. 28, 2010, at 1A, *available at* http://goo.gl/L0ELRU.

[7] *Id.*

[8] NAT. PRODS. ASS'N, *About the Natural Products Association*, NPAINFO.ORG, http://goo.gl/a6Z7v4 (last visited July 21, 2016).

37.     Throughout the period from May 2011 to the date of class certification, Kraft systematically marketed and advertised the Breakstone Products as "All Natural" on the Breakstone Products' packaging. Kraft prominently placed the words "All Natural" in a central location on the labeling of every package of the Products, as the representative image below illustrates:



38.     Kraft also prominently placed the words "All Natural" on the lids of the Breakstone Products.

39.     By consistently and systematically marketing and advertising the Breakstone Products as "All Natural" on the packaging throughout the period from May 2011to the date of class certification, Kraft ensured that all consumers purchasing the Breakstone's Products were, and all consumers purchasing the Breakstone's Products in the future will be, exposed to the misrepresentation that the Breakstone's Products are "All Natural."

40.     Similarly, to capitalize on consumers' rising demand for natural food, Daisy labels and markets the Daisy Products as "Natural," thereby setting the Daisy Products apart from other competing sour cream products.

41.    Throughout the period from April 17, 2011 to the date of class certification, Daisy systematically marketed and advertised the Daisy Products as "Natural" on the Daisy Products' packaging. Daisy prominently placed the word "Natural" in a central location on the labeling of every package of the Daisy Products, as the representative images below illustrate:

 

42.    Daisy also prominently placed the word "Natural" on the lids of the Daisy Products.

43.    Daisy's marketing of the Daisy Products on its website, www.daisybrand.com, reinforces the Daisy Products' alleged "Natural" quality. On the website, Daisy proclaims:

a.    "The Daisy Difference . . . ***Our dedication to natural ingredients*** with no preservatives makes for great-tasting products and ***sets us apart from others***."[9]

b.    "What makes Daisy America's favorite sour cream? It could be the creamy taste, the freshness, ***or that it's 100% natural*** with no additives or preservatives."[10]

c.    "Good food really does taste better with Daisy Sour Cream. ***Maybe that's because it's 100% pure, 100% natural, with nothing added***—and it's a creamy complement to dips, main dishes, and desserts."[11]

---

[9]  *Our Story*, DAISYBRAND.COM (Mar. 14, 2015), https://goo.gl/MzMXNI (emphasis added) (archived by Internet Archive WayBack Machine).

[10]  *Sour Cream*, DAISYBRAND.COM (Mar. 22, 2015), https://goo.gl/NH73X0 (emphasis added) (archived by Internet Archive WayBack Machine).

[11]  *Our Story*, DAISYBRAND.COM, *supra* note 7 (emphasis added).

44.     By consistently and systematically marketing and advertising the Daisy Products as "Natural" on the Daisy Products' packaging throughout the period from April 17, 2011 to the date of class certification, Daisy ensured that all consumers purchasing the Daisy Products were, and all consumers purchasing the Daisy Products in the future will be, exposed to the misrepresentation that the Daisy Products are "Natural."

## II. THE SOUR CREAM PRODUCTS AT ISSUE CONTAIN INGREDIENTS DERIVED FROM GENETICALLY MODIFIED ORGANISMS

45.     The Breakstone Products contain ingredients derived from GMOs.

46.     On information and belief, the cows that produce the cream that Kraft uses to make the Breakstone Products are fed GMO corn and/or GMO soy, which is not natural.

47.     The Daisy Products contain ingredients derived from GMOs.

48.     On information and belief, the cows that produce the cream that Daisy uses to make the Daisy Products are fed GMO corn and/or GMO soy, which is not natural.

49.     The U.S. Department of Agriculture ("USDA") does not allow animal products to be certified as "organic" if the animals consume GMO feed.[12] The USDA has explained its logic in the context of dairy production. In describing the production of organic milk from a cow grazing in a pasture, it stated that "the milk from that dairy cow is analogous to the crops harvested from the same field[.]"[13] The USDA made clear that if a cow consumes GMO grass, the milk the cow produces is not "organic."[14] The USDA has recognized that the characteristics of an animal's feed

---

[12] Miles McEvoy, U.S. Dep't of Agric., *Organic 101: Can GMOs Be Used in Organic Products?*, USDA.Gov: The USDA Blog (May 17, 2013, at 1:20 PM), http://goo.gl/fd9O3t.

[13] National Organic Program—Revisions to Livestock Standards Based on Court Order (Harvey v. Johanns) and 2005 Amendment to the Organic Foods Production Act of 1990 (OFPA), 71 Fed. Reg. 24,820, 24,823 (Apr. 27, 2006).

[14] *Id.*

(such as whether the feed is GMO) will affect the characteristics of the animal's end products.

## III.     GMOS ARE NEITHER "NATURAL" NOR "ALL NATURAL"

50.     GMOs are organisms in which the genetic material (*i.e.*, DNA) has been altered in a way that does not occur naturally, allowing the organism to exhibit traits that would not appear in nature.

51.     For example, "scientists have applied biotechnology to create crops that are resistant to certain herbicides. Herbicide tolerant crops contain new genes that allow the plant to tolerate these herbicides. The most common herbicide-tolerant crops (cotton, corn, soybeans, and canola) are those that are resistant to glyphosate[.]"[15]

52.     As of 2012, approximately 88% of the corn planted in the United States was grown from genetically modified seed, while 93% of the soy planted in the United States was grown from genetically modified seed.[16]

53.     According to many sources, including industry, government, and health organizations, GMOs are not "Natural," let alone "All Natural." GMOs are created artificially in a laboratory through genetic engineering.

54.     As recently as December 28, 2014, Monsanto Company, the world's dominant producer of genetically modified seeds, defined GMOs as "[p]lants or animals that ***have had their genetic makeup altered to exhibit traits that are not naturally theirs***. In general, genes are taken

---

[15] U.S. ENVTL. PROT. AGENCY, *EPA's Regulation of Biotechnology for Use in Pest Management*, EPA.GOV (last updated Mar. 11, 2016), https://goo.gl/3Qowp6. The International Agency for Research on Cancer has recognized glyphosate as "probably carcinogenic to humans." INT'L AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORG., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 112: Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015), *available at* http://goo.gl/8IR9sK *and* http://goo.gl/NxjNVq (glyphosate monograph).

[16] Clive James, INT'L SERV. FOR THE ACQUISITION OF AGRI-BIOTECH APPLICATIONS, *ISAAA Briefs: Brief 44: Global Status of Commercialized Biotech/GM Crops: 2012*, at 17 (2012), *available at* http://goo.gl/EXZvoC.

(copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."[17]

55.     Romer Labs, a company that provides diagnostic solutions to the agricultural industry, discusses and defines GMOs as follows: "Agriculturally important plants are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to *express novel traits that normally would not appear in nature*, such as herbicide or insect resistance. Seed harvested from GMO plants will also contain these modifications."[18]

56.     International bodies, such as the World Health Organization, define GMOs as "organisms (i.e. plants, animals or microorganisms) in which the genetic material (DNA) *has been altered in a way that does not occur naturally* by mating and/or natural recombination."[19]

57.     The U.S. Environmental Protection Agency has distinguished conventional breeding of plants from genetic engineering using modern scientific techniques, as follows:

> **4. What is the difference between plant-incorporated protectants produced through genetic engineering and those produced through conventional breeding?**
>
> **Conventional breeding** is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination. For a plant-incorporated pesticide, one would breed a plant that produces a pesticide with a sexually compatible plant that does not possess this property but possesses other properties of interest

---

[17] *Compare Glossary*, MONSANTO.COM (Dec. 28, 2014), https://goo.gl/CfkouZ (emphasis added) (Monsanto Company's definition of "Genetically Modified Organisms (GMO)" as of December 28, 2014, archived on Internet Archive WayBack Machine), *with Glossary*, MONSANTO.COM (2015), http://goo.gl/WWd0Z9 (definition of "Genetically Modified Organisms (GMO)" currently on Monsanto Company's website).

[18] *Genetically Modified Organisms*, ROMERLABS.COM (2012), http://goo.gl/A6xGCS (emphasis added).

[19] WORLD HEALTH ORG., *Frequently asked questions on genetically modified foods*, WHO.INT (2016), http://goo.gl/TEW2Vh (emphasis added).

to the breeder, e.g., sweeter fruit. Then, out of the offspring, the breeder would choose the offspring plant that produces the pesticide, and therefore expresses the desired pesticidal trait, as well as producing sweeter fruit.

**Genetically engineered** plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material. For example, a desired gene that produces a desired pesticides (*e.g.*, the insecticidal protein Bt from the bacterium, *Bacillus thuringiensis*) can be isolated from another organism, such as a bacterium, and then inserted into a plant. The desired gene becomes part of the plant's DNA. The plant then expresses the incorporated gene and produces the pesticidal protein as it would one of its own components.[20]

58.    As Consumers Union explained:

Genetic engineering is not just an extension of conventional breeding. In fact, it differs profoundly. As a general rule, conventional breeding develops new plant varieties by the process of *selection*, and seeks to achieve expression of genetic material which is already present within a species. . . . Conventional breeding employs processes that occur in nature, such as sexual and asexual reproduction. . . .

Genetic engineering works primarily through *insertion* of genetic material, although gene insertion must also be followed up by selection. This insertion process does not occur in nature.[21]

59.    As the definitions and descriptions above from a wide array of industry, government, and health organizations indicate, GMOs are neither "Natural" nor "All Natural" because they do not naturally occur. Scientists create GMOs artificially in a laboratory through genetic engineering.

60.    Thus, by claiming the Breakstone's Products are "All Natural," Kraft deceives and misleads reasonable consumers, since the Breakstone Products contain non-natural ingredients

---

[20] OFFICE OF PREVENTION, PESTICIDES, AND TOXIC SUBSTANCES, U.S. ENVTL. PROT. AGENCY, *Questions & Answers: Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules* 3 (2001) (bold in original).

[21] Michael K. Hansen, CONSUMER POLICY INSTITUTE / CONSUMERS UNION, *Genetic engineering is not an extension of conventional plant breeding; how genetic engineering differs from conventional breeding, hybridization, wide crosses and horizontal gene transfer* 1 (2000), *available at* http://goo.gl/RTJiA3 (emphasis in original).

derived from GMOs.

61.     Similarly, by claiming the Daisy Products are "Natural," Daisy deceives and misleads reasonable consumers, since the Daisy Products contain non-natural ingredients derived from GMOs.

## IV.   REASONABLE CONSUMERS DO NOT BELIEVE PRODUCTS CONTAINING INGREDIENTS DERIVED FROM GMOS ARE "ALL NATURAL" OR "NATURAL"

62.     By claiming the Breakstone Products are "All Natural," Kraft deceives and misleads reasonable consumers.

63.     Kraft's packaging of the Breakstone Products unequivocally demonstrates its intent to persuade consumers that the Breakstone Products are "All Natural."

64.     In fact, reasonable consumers, including Plaintiff, purchased the Breakstone Products based upon the belief that they are "All Natural." However, a reasonable consumer would not deem the Breakstone Products "All Natural" if he/she knew the Breakstone Products contain GMOs.

65.     Similarly, by claiming the Daisy Products are "Natural," Daisy deceives and misleads reasonable consumers.

66.     Daisy's packaging of the Daisy Products unequivocally demonstrates its intent to persuade consumers that the Daisy Products are "Natural."

67.     In fact, reasonable consumers, including Plaintiff, purchased the Daisy Products based upon the belief that they are "Natural." However, a reasonable consumer would not deem the Daisy Products "Natural" if he/she knew the Daisy Products contain GMOs.

68.     By way of example, a 2014 consumer survey confirmed that a majority (64%) of consumers think that the "natural" label on meat or poultry products currently means the animals'

feed contained no GMOs.[22]

69.     According to another consumer survey, "[e]ighty-six percent of consumers expect the 'natural' label to mean that processed food does not contain any artificial ingredients."[23]

70.     Similarly, reasonable consumers believe that if a cow consumes GMO corn or soy, then the cow's end products are not "Natural" or "All Natural." Thus, reasonable consumers believe that if a cow consumes GMO grass, corn, or soy and then produces cream, the cream is not "Natural" or "All Natural," and products derived from the cream, such as sour cream, are likewise not "Natural" or "All Natural."

## V.   PLAINTIFF, THE KRAFT CLASSES MEMBERS, AND THE DAISY CLASSES MEMBERS REASONABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS

71.     Consumers rely on food label representations and information in making purchasing decisions.

72.     The marketing of the Breakstone Products as "All Natural" in a prominent location on the labels of all of the Breakstone Products throughout the period from May 2011 to the date of class certification evidences Kraft's awareness that "All Natural" claims are material to consumers.

73.     Similarly, the marketing of the Daisy Products as "Natural" in a prominent location on the labels of all of the Daisy Products throughout the period from April 17, 2011 to the date of class certification evidences Daisy's awareness that "Natural" claims are material to consumers.

74.     Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such

---

[22] CONSUMER REPORTS NAT'L RESEARCH CTR., *Food Labels Survey: 2014 Nationally-Representative Phone Survey* 6 (2014), *available at* http://goo.gl/jPQoQU.

[23] Urvashi Rangan, CONSUMERS UNION, *Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission* (2010), *available at* https://goo.gl/U69V8G (also accessible as Comment 58 at https://goo.gl/5FfLHY).

information in making purchase decisions.

75.     Plaintiff and the Kraft Classes members reasonably relied to their detriment on Kraft's misleading representations and omissions.

76.     Similarly, Plaintiff and the Daisy Classes members reasonably relied to their detriment on Daisy's misleading representations and omissions.

77.     Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff, the Kraft Classes members, and the Daisy Classes members.

## VI.    DEFENDANTS' WRONGFUL CONDUCT CAUSED INJURY TO PLAINTIFF, THE KRAFT CLASSES MEMBERS, AND THE DAISY CLASSES MEMBERS

78.     In making the false, misleading, and deceptive representations and omissions described herein, Kraft knew and intended that consumers would pay a premium for Breakstone Products labeled "All Natural" over comparable products not so labeled.

79.     As an immediate, direct, and proximate result of Kraft's false, misleading, and deceptive representations and omissions, Kraft injured Plaintiff and the Kraft Classes members, in that they:

      a.     paid a sum of money for Breakstone Products that were not what Kraft represented;

      b.     paid a premium price for Breakstone Products that were not what Kraft represented;

      c.     were deprived of the benefit of the bargain because the Breakstone Products they purchased were different from what Kraft warranted;

      d.     were deprived of the benefit of the bargain because the Breakstone Products they purchased had less value than what Kraft represented;

      e.     did not receive Breakstone Products that measured up to their expectations, which Kraft created;

   f. ingested a substance that was of a different quality than what Kraft promised; and

   g. were denied the benefit of the beneficial properties of the natural foods Kraft promised.

80. Had Kraft not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Kraft Classes members would not have been willing to pay the same amount for the Breakstone Products they purchased, and, consequently, Plaintiff and the Kraft Nationwide Class members would not have been willing to purchase the Breakstone Products.

81. Plaintiff and the Kraft Classes members paid for Breakstone Products that were "All Natural" but received Breakstone Products that were not "All Natural." The Breakstone Products Plaintiff and the Kraft Classes members received were worth less than the Breakstone Products for which they paid.

82. Based on Kraft's misleading and deceptive representations, Kraft was able to, and did, charge a premium price for the Breakstone Products over the cost of competitive products not bearing an "All Natural" label.

83. Plaintiff and the Kraft Classes members all paid money for the Breakstone Products. However, Plaintiff and the Kraft Classes members did not obtain the full value of the advertised Breakstone Products due to Kraft's misrepresentations and omissions. Plaintiff and the Kraft Classes members purchased, purchased more of, and/or paid more for, the Breakstone Products than they would have had they known the truth about the Breakstone Products. Consequently, Plaintiff and the Kraft Classes members have suffered injury in fact and lost money as a result of Kraft's wrongful conduct.

84. By way of example, Breakstone's Products cost approximately $1.48 per 8 ounce container, or $0.185 per ounce, at Walmart in Valley Stream, New York.

85.     Alternative sour cream products produced by Kraft that do not contain the false and misleading "All Natural" representation cost less than Breakstone's Products. For example, Simply Kraft Sour Cream costs $0.98 per 16 ounce container, or $0.123 per ounce, at Walmart in Valley Stream, New York.

86.     Thus, to purchase Breakstone's Products, which Kraft falsely and misleadingly labels "All Natural," Plaintiff and the Kraft Classes members paid a premium over comparable sour cream products that are not labeled "All Natural."

87.     Similarly, in making the false, misleading, and deceptive representations and omissions described herein, Daisy knew and intended that consumers would pay a premium for Daisy Products labeled "Natural" over comparable products not so labeled.

88.     As an immediate, direct, and proximate result of Daisy's false, misleading, and deceptive representations and omissions, Daisy injured Plaintiff and the Daisy Classes members, in that they:

    a.     paid a sum of money for Daisy Products that were not what Daisy represented;

    b.     paid a premium price for Daisy Products that were not what Daisy represented;

    c.     were deprived of the benefit of the bargain because the Daisy Products they purchased were different from what Daisy warranted;

    d.     were deprived of the benefit of the bargain because the Daisy Products they purchased had less value than what Daisy represented;

    e.     did not receive Daisy Products that measured up to their expectations, which Daisy created;

    f.     ingested a substance that was of a different quality than what Daisy promised; and

    g.     were denied the benefit of the beneficial properties of the natural foods Daisy promised.

89.     Had Daisy not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Daisy Classes members would not have been willing to pay the same amount for the Daisy Products they purchased, and, consequently, Plaintiff and the Daisy Classes members would not have been willing to purchase the Daisy Products.

90.     Plaintiff and the Daisy Classes members paid for Daisy Products that were "Natural" but received Daisy Products that were not "Natural." The Daisy Products Plaintiff and the Daisy Classes members received were worth less than the Daisy Products for which they paid.

91.     Based on Daisy's misleading and deceptive representations, Daisy was able to, and did, charge a premium price for the Daisy Products over the cost of competitive products not bearing a "Natural" label.

92.     Plaintiff and the Daisy Classes members all paid money for the Daisy Products. However, Plaintiff and the Daisy Classes members did not obtain the full value of the advertised Daisy Products due to Daisy's misrepresentations and omissions. Plaintiff and the Daisy Classes members purchased, purchased more of, and/or paid more for, the Daisy Products than they would have had they known the truth about the Daisy Products. Consequently, Plaintiff and the Daisy Classes members have suffered injury in fact and lost money as a result of Daisy's wrongful conduct.

93.     By way of example, Daisy's sour cream costs approximately $1.34 per 8 ounce container, or $0.168 per ounce, at Walmart in Valley Stream, New York.

94.     Alternative sour cream products that do not contain the false and misleading "Natural" representation cost less than Daisy's sour cream. For example, as stated above, Simply Kraft Sour Cream costs $0.98 per 16 ounce container, or $0.123 per ounce, at Walmart in Valley Stream, New York.

95.     Thus, to purchase Daisy's sour cream, which Daisy falsely and misleadingly labels "Natural," Plaintiff and the Daisy Classes members paid a premium over comparable sour cream products that are not labeled "Natural."

## CLASS ALLEGATIONS

### I.    THE KRAFT CLASSES

96.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks to represent the following classes comprised of the "Kraft Nationwide Class" and the "Kraft New York Class" (collectively, the "Kraft Classes"):

> **The Kraft Nationwide Class**. All consumers within the United States who purchased one or more of the Breakstone Products during the applicable liability period for their personal use, rather than for resale or distribution.

> **The Kraft New York Class**: All consumers within the United States who purchased one or more of the Breakstone Products in the State of New York during the applicable liability period for their personal use, rather than for resale or distribution.

97.     Excluded from the Kraft Classes are: (a) Defendants, Defendants' board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Kraft Classes in accordance with Court-approved procedures.

98.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as individual Kraft Classes members would use to prove those elements in individual actions alleging the same claims.

99.     **Numerosity, FED. R. CIV. P. 23(a)(1)**. The members of the Kraft Classes are so

numerous that individual joinder of all Kraft Classes members is impracticable. While the exact number of Kraft Classes members is presently unknown to Plaintiff, based on Kraft's volume of sales, Plaintiff estimates that the Kraft Classes members number in the thousands.

100.    Members of the Kraft Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

101.    **Commonality and Predominance, FED. R. CIV. P. 23(a)(2), (b)(3)**. This action involves common questions of law or fact that predominate over any questions affecting individual Kraft Classes members.

102.    All Kraft Classes members were exposed to Kraft's deceptive and misleading advertising and marketing claims that the Breakstone Products were "All Natural" because those claims were on the packaging of each and every Breakstone Product.

103.    Furthermore, common questions of law or fact include:

a.    Whether Kraft materially misrepresented to the Kraft Classes members that the Breakstone Products are "All Natural";

b.    Whether Kraft's misrepresentations and omissions were material to reasonable consumers;

c.    Whether Kraft's labeling, marketing, and sale of the Breakstone Products constitutes an unfair and deceptive business practices;

d.    Whether Kraft's conduct described above constitutes a breach of warranty;

e.    Whether Plaintiff and the Kraft Classes members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

f.    Whether Plaintiff and the Kraft Classes members are entitled to equitable relief, including but not limited to injunctive relief and equitable restitution.

104.    Kraft engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Kraft Classes members. Similar or identical

statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

105.    **Typicality, FED. R. CIV. P. 23(a)(3)**. Plaintiff's claims are typical of the claims of Kraft Classes members because, among other things, Kraft injured all Kraft Classes members through the uniform misconduct described herein, and all Kraft Classes members were subject to Kraft's false, deceptive, misleading, and unfair advertising and marketing practices and representations, including the false claim that the Breakstone Products are "All Natural."

106.    Further, there are no defenses available to Kraft that are unique to Plaintiff.

107.    **Adequacy of Representation, FED. R. CIV. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Kraft Classes. Plaintiff does not have any interests that are adverse to those of the Kraft Classes members. Plaintiff has retained competent counsel experienced in class action litigation and intends to prosecute this action vigorously.

108.    **Declaratory and Injunctive Relief, FED. R. CIV. P. 23(b)(2)**. Kraft has acted or refused to act on grounds generally applicable to Plaintiff and the Kraft Classes members, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Kraft Classes as a whole.

109.    **Superiority, FED. R. CIV. P. 23(b)(3)**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Since the damages suffered by individual class

members are relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged, while an important public interest will be served by addressing the matter as a class action.

## II.    THE DAISY NATIONWIDE CLASS

110.    Additionally, Plaintiff brings this action as a class action pursuant to Rule 23 on behalf of the following classes comprised of  the "Daisy Nationwide Class" and the "Daisy New York Class" (collectively, the "Daisy Classes"):

> **The Daisy Nationwide Class**. All consumers within the United States who purchased one or more of the Daisy Products during the applicable liability period for their personal use, rather than for resale or distribution.

> **The Daisy New York Class.**  All consumers within the United States who purchased one or more of the Daisy Products within the State of New York during the applicable liability period for their personal use, rather than for resale or distribution.

111.    Excluded from the Daisy Classes are: (a) Defendants, Defendants' board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Daisy Nationwide Class in accordance with Court-approved procedures.

112.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as individual Daisy Classes members would use to prove those elements in individual actions alleging the same claims.

113.    **Numerosity, FED. R. CIV. P. 23(a)(1)**. The members of the Daisy Classes are so numerous that individual joinder of all Daisy Classes members is impracticable. While the exact

number of Daisy Classes members is presently unknown to Plaintiff, based on Daisy's volume of sales, Plaintiff estimates that the Daisy Classes members number in the thousands.

114.     Members of the Daisy Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

115.     **Commonality and Predominance, Fed. R. Civ. P. 23(a)(2), (b)(3)**. This action involves common questions of law or fact that predominate over any questions affecting individual Daisy Classes members.

116.     All Daisy Classes members were exposed to Daisy's deceptive and misleading advertising and marketing claims that the Daisy Products were "Natural" because those claims were on the packaging of each and every Daisy Product.

117.     Furthermore, common questions of law or fact include:

g.     Whether Daisy materially misrepresented to the Daisy Classes members that the Daisy Products are "Natural";

h.     Whether Daisy's misrepresentations and omissions were material to reasonable consumers;

i.     Whether Daisy's labeling, marketing, and sale of the Daisy Products constitutes an unfair and deceptive business practices;

j.     Whether Daisy's conduct described above constitutes a breach of warranty;

k.     Whether Plaintiff and the Daisy Classes members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

l.     Whether Plaintiff and the Daisy Classes members are entitled to equitable relief, including but not limited to injunctive relief and equitable restitution.

118.     Daisy engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Daisy Classes members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual

questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

119. **Typicality, FED. R. CIV. P. 23(a)(3)**. Plaintiff's claims are typical of the claims of Daisy Classes members because, among other things, Daisy injured all Daisy Classes members through the uniform misconduct described herein, and all Daisy Classes members were subject to Daisy's false, deceptive, misleading, and unfair advertising and marketing practices and representations, including the false claim that the Daisy Products are "Natural."

120. Further, there are no defenses available to Daisy that are unique to Plaintiff.

121. **Adequacy of Representation, FED. R. CIV. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Daisy Classes. Plaintiff does not have any interests that are adverse to those of the Daisy Classes members. Plaintiff has retained competent counsel experienced in class action litigation and intends to prosecute this action vigorously.

122. **Declaratory and Injunctive Relief, FED. R. CIV. P. 23(b)(2)**. Daisy has acted or refused to act on grounds generally applicable to Plaintiff and the Daisy Classes members, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Daisy Classes as a whole.

123. **Superiority, FED. R. CIV. P. 23(b)(3)**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Since the damages suffered by individual class members are relatively small, the expense and burden of individual litigation make it virtually

impossible for the class members to seek redress for the wrongful conduct alleged, while an important public interest will be served by addressing the matter as a class action.

## CLAIMS

**I.     CLAIMS AGAINST KRAFT HEINZ FOODS COMPANY**

### CLAIM I

**Violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act,
15 U.S.C. § 2301 *et seq.*
Against Kraft Heinz Foods Company, on Behalf of the Kraft Nationwide Class**

124.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

125.   Plaintiff brings this claim on behalf of the Kraft Nationwide Class against Kraft for violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 *et seq.* (the "Magnuson-Moss Act").

126.   The Magnuson-Moss Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Magnuson-Moss Act], or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1).

127.   At all relevant times, Plaintiff and the Kraft Nationwide Class members were "consumers," as that term is defined in 15 U.S.C. § 2301(3).

128.   At all relevant times, Kraft was a "supplier," as that term is defined in 15 U.S.C. § 2301(4), because it was a "person engaged in the business of making a consumer product directly or indirectly available to consumers."

129.   At all relevant times, Kraft was a "warrantor," as that term is defined in 15 U.S.C. § 2301(5), because it was a "supplier or other person who gives or offers to give a written warranty or

who is or may be obligated under an implied warranty."

130.    The Breakstone Products that Plaintiff and the Kraft Nationwide Class members purchased were "consumer products," as that term is defined in 15 U.S.C. § 2301(6), because the Breakstone Products were "tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."

131.    By reason of Kraft's breach of its express warranties regarding the ability of the Breakstone Products to be "All Natural," Kraft has caused economic damage to Plaintiff and the Kraft Nationwide Class members and has violated the statutory rights due to them under the Magnuson-Moss Act.

132.    Therefore, Plaintiff prays for relief as set forth below.

## CLAIM II

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,
N.Y. GEN. BUS. LAW § 349 *et seq.*
New York General Business Law Section 349
Against Kraft Heinz Foods Company, on Behalf of the Kraft New York Class**

133.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

134.    Plaintiff brings this claim on behalf of the Kraft New York Class against Kraft for violation of section 349 of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349 *et seq.*

135.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 349(a).

136.    As fully alleged above, by advertising, marketing, distributing, and/or selling the Breakstone Products with claims that they were "All Natural" to Plaintiff and the Kraft New York

Class members, Kraft engaged in, and continues to engage in, deceptive acts and practices because the Breakstone Products are in fact made from ingredients derived from GMOs, which are not natural.

137.    Plaintiff and the Kraft New York Class members believed Kraft's representations that the Breakstone Products they purchased were "All Natural." Plaintiff and the Kraft New York Class members would not have purchased the Breakstone's Products at a premium price had they known the Breakstone Products were not actually "All Natural" because they were derived from GMOs.

138.    Plaintiff and the Kraft New York Class members were injured in fact and lost money as a result of Kraft's conduct of improperly describing the Breakstone Products as "All Natural." Plaintiff and the Kraft New York Class members paid for "All Natural" Breakstone Products, but did not receive such products.

139.    The Breakstone Products Plaintiff and the Kraft New York Class members received were worth less than the Breakstone Products for which they paid. Plaintiff and the Kraft New York Class members paid a premium price on account of Kraft's misrepresentations that the Breakstone Products were "All Natural."

140.    By reason of the foregoing, Kraft's conduct, as alleged herein, constitutes deceptive acts and practices in violation of New York General Business Law section 349, and Kraft is liable to Plaintiff and the Kraft New York Class members for the damages they have suffered as a result of Kraft's actions. The amount of such damages is to be determined at trial, but will not be less than $50.00. N.Y. GEN. BUS. LAW § 349(h).

141.    Plaintiff and the Kraft New York Class members seek to enjoin such unlawful, deceptive acts and practices described above. Each of the Kraft New York Class members will be irreparably harmed unless the Court enjoins Kraft's unlawful, deceptive actions in that Kraft will

continue to falsely and misleadingly advertise the Breakstone Products as "All Natural."

142.    Plaintiff and the Kraft New York Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Kraft from continuing to disseminate its false and misleading statements, and other relief allowable under New York General Business Law section 349.

143.    Therefore, Plaintiff prays for relief as set forth below.

## CLAIM III

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,**
**N.Y. GEN. BUS. LAW § 349 *et seq.***
**New York General Business Law Section 350**
**Against Kraft Heinz Foods Company, on Behalf of the Kraft New York Class**

144.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

145.    Plaintiff brings this claim on behalf of the Kraft New York Class against Kraft for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349 *et seq.*

146.    New York General Business Law section 350 makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York unlawful. N.Y. GEN. BUS. LAW. § 350.

147.    Under section 350, the term "false advertising" means, in relevant part, "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a(1).

148.    As fully alleged above, by advertising, marketing, distributing, and/or selling the Breakstone Products with claims that they were "All Natural" to Plaintiff and the Kraft New York Class members, Kraft violated New York General Business Law section 350 by engaging in, and it

continues to violate section 350 by continuing to engage in, false advertising concerning the composition of the Breakstone Products, which are made from ingredients derived from GMOs, which are not natural.

149.     Plaintiff and the Kraft New York Class members believed Kraft's representations that the Breakstone Products were "All Natural." Plaintiff and the Kraft New York Class members would not have purchased the Breakstone Products had they known the Breakstone Products were not, in fact, "All Natural" because they contained ingredients derived from GMOs.

150.     Plaintiff and the Kraft New York Class members were injured in fact and lost money as a result of Kraft's conduct of improperly describing the Breakstone Products as "All Natural." Plaintiff and the Kraft New York Class members paid for Breakstone Products that were "All Natural," but did not receive such products.

151.     The Breakstone Products Plaintiff and the Kraft New York Class members received were worth less than the Breakstone Products for which they paid. Plaintiff and the Kraft New York Class members paid a premium price on account of Kraft's misrepresentations that the Breakstone Products were "All Natural."

152.     Plaintiff and the Kraft New York Class members seek to enjoin such unlawful acts and practices as described above. Each of the Kraft New York Class members will be irreparably harmed unless the Court enjoins Kraft's unlawful actions, in that Plaintiff and the Kraft New York Class members will continue to be unable to rely on Kraft's representations that the Breakstone Products are "All Natural."

153.     Plaintiff and the Kraft New York Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Kraft from continuing to disseminate its false and misleading statements, and other relief

allowable under New York General Business Law section 350.

154.    Therefore, Plaintiff prays for relief as set forth below.

## CLAIM IV

**Breach of Express Warranty**
**Under the Laws of Each State in the United States and the District of Columbia**
**Against Kraft Heinz Foods Company, on Behalf of the Kraft Nationwide Class**

155.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

156.    Plaintiff brings this claim on behalf of the Kraft Nationwide Class against Kraft for breach of express warranty under the laws of each State in the United States and the District of Columbia.

157.    Plaintiff and the Kraft Nationwide Class members each formed a contract with Kraft at the time they purchased the Breakstone Products.

158.    As part of each contract, Kraft represented that the Breakstone Products were "All Natural."

159.    Kraft's representations that the Breakstone Products were "All Natural" constituted express warranties and became part of the basis of the bargain between Plaintiff and the Kraft Nationwide Class members, on the one hand, and Kraft, on the other.

160.    Kraft represented that the Breakstone Products were "All Natural" to induce Plaintiff and the Kraft Nationwide Class members to purchase the Breakstone Products.

161.    Plaintiff and the Kraft Nationwide Class members relied on Kraft's representations that the Breakstone's Products were "All Natural" in purchasing the Breakstone Products.

162.    Plaintiff and the Kraft Nationwide Class members have performed all conditions precedent to Kraft's liability under the above-referenced contracts when they purchased the

Breakstone Products for their ordinary purposes.

163.    Kraft breached its express warranties about the Breakstone Products because the Breakstone Products contain ingredients derived from GMOs and are, thus, not "All Natural."

164.    Kraft breached the following state warranty laws:

a.    ALA. CODE § 7-2-313 (Alabama);

b.    ALASKA STAT. ANN. § 45.02.313 (Alaska);

c.    ARIZ. REV. STAT. ANN. § 47-2313 (Arizona);

d.    ARK. CODE ANN. § 4-2-313 (Arkansas);

e.    CAL. COM. CODE § 2313 (California);

f.    COLO. REV. STAT. ANN. § 4-2-313 (Colorado);

g.    CONN. GEN. STAT. ANN. § 42a-2-313 (Connecticut);

h.    DEL. CODE ANN. tit. 6, § 2-313 (Delaware);

i.    D.C. CODE ANN. § 28:2-313 (District of Columbia);

j.    FLA. STAT. ANN. § 672.313 (Florida);

k.    GA. CODE ANN. § 11-2-313 (Georgia);

l.    HAW. REV. STAT. ANN. § 490:2-313 (Hawai'i);

m.    IDAHO CODE ANN. § 28-2-313 (Idaho);

n.    810 ILL. COMP. STAT. ANN. 5/2-313 (Illinois);

o.    IND. CODE ANN. § 26-1-2-313 (Indiana);

p.    IOWA CODE ANN. § 554.2313 (Iowa);

q.    KAN. STAT. ANN. § 84-2-313 (Kansas);

r.    KY. REV. STAT. ANN. § 355.2-313 (Kentucky);

s.    LA. CIV. CODE ANN. art. 2520 (Louisiana);

t.      ME. REV. STAT. ANN. tit. 11, § 2-313 (Maine);

u.      MD. CODE ANN., COM. LAW § 2-313 (Maryland);

v.      MASS. GEN. LAWS ANN. ch. 106, § 2-313 (Massachusetts);

w.      MICH. COMP. LAWS ANN. § 440.2313 (Michigan);

x.      MINN. STAT. ANN. § 336.2-313 (Minnesota);

y.      MISS. CODE. ANN. § 75-2-313 (Mississippi);

z.      MO. ANN. STAT. § 400.2-313 (Missouri);

aa.     MONT. CODE ANN. § 30-2-313 (Montana);

bb.     NEB. REV. STAT. ANN. § UCC § 2-313 (Nebraska);

cc.     NEV. REV. STAT. ANN. § 104.2313 (Nebraska);

dd.     N.H. REV. STAT. ANN. § 382-A:2-313 (New Hampshire);

ee.     N.J. STAT. ANN. § 12A:2-313 (New Jersey);

ff.     N.M. STAT. ANN. § 55-2-313 (New Mexico);

gg.     N.Y. U.C.C. Law § 2-313 (New York);

hh.     N.C. GEN. STAT. ANN. § 25-2-313 (North Carolina);

ii.     N.D. CENT. CODE ANN. § 41-02-30 (North Dakota);

jj.     OHIO REV. CODE ANN. § 1302.26 (Ohio);

kk.     OKLA. STAT. ANN. tit. 12A, § 2-313 (Oklahoma);

ll.     OR. REV. STAT. ANN. § 72.3130 (Oregon);

mm.     13 PA. STAT. AND CONS. STAT. ANN. § 2313 (Pennsylvania);

nn.     6A R.I. GEN. LAWS ANN. § 6A-2-313 (Rhode Island);

oo.     S.C. CODE ANN. § 36-2-313 (South Carolina);

pp.     S.D. CODIFIED LAWS § 57A-2-313 (South Dakota);

qq. TENN. CODE ANN. § 47-2-313 (Tennessee);

rr. TEX. BUS. & COM. CODE ANN. § 2.313 (Texas);

ss. UTAH CODE ANN. § 70A-2-313 (Utah);

tt. VT. STAT. ANN. tit. 9A, § 2-313 (Vermont);

uu. VA. CODE ANN. § 59.1-504.2 (Virginia);

vv. WASH. REV. CODE ANN. § 62A.2-313 (Washington);

ww. W. VA. CODE ANN. § 46-2-313 (West Virginia);

xx. WIS. STAT. ANN. § 402.313 (Wisconsin); and

yy. WYO. STAT. ANN. § 34.1-2-313 (Wyoming).

165.    As a result of Kraft's breaches of express warranties, Plaintiff and the Kraft Nationwide Class members were damaged in the amount of the purchase price and/or a premium they paid for the Breakstone Products, in an aggregate amount that Plaintiff will prove at trial.

166.    Within a reasonable time after Plaintiff knew or should have known of Kraft's breaches of express warranties, Plaintiff, individually and on behalf of the Kraft Nationwide Class members, placed Kraft on notice thereof.

167.    Therefore, Plaintiff prays for relief as set forth below.

## II.    CLAIMS AGAINST DAISY BRAND, LLC

## CLAIM V

**Violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 *et seq.***
**Against Daisy Brand, LLC, on Behalf of the Daisy Nationwide Class**

168.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

169.    Plaintiff brings this claim on behalf of the Daisy Nationwide Class against Daisy for

violation of the Magnuson-Moss Act. *See* 15 U.S.C. § 2310(d)(1).

170.     At all relevant times, Plaintiff and the Daisy Nationwide Class members were "consumers," as that term is defined in 15 U.S.C. § 2301(3).

171.     At all relevant times, Daisy was a "supplier," as that term is defined in 15 U.S.C. § 2301(4), because it was a "person engaged in the business of making a consumer product directly or indirectly available to consumers."

172.     At all relevant times, Daisy was a "warrantor," as that term is defined in 15 U.S.C. § 2301(5), because it was a "supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty."

173.     The Daisy Products that Plaintiff and the Daisy Nationwide Class members purchased were "consumer products," as that term is defined in 15 U.S.C. § 2301(6), because the Daisy Products were "tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."

174.     By reason of Daisy's breach of its express warranties regarding the ability of the Daisy Products to be "Natural," Daisy has caused economic damage to Plaintiff and the Daisy Nationwide Class members and has violated the statutory rights due to them under the Magnuson-Moss Act.

175.     Therefore, Plaintiff prays for relief as set forth below.

## CLAIM VI

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,
N.Y. Gen. Bus. Law § 349 *et seq.*
New York General Business Law Section 349
Against Daisy Brand, LLC, on Behalf of the Daisy New York Class**

176.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

177.    Plaintiff brings this claim on behalf of the Daisy New York Class against Daisy for violation of section 349 of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349 *et seq.*

178.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 349(a).

179.    As fully alleged above, by advertising, marketing, distributing, and/or selling the Daisy Products with claims that they were "Natural" to Plaintiff and the Daisy New York Class members, Daisy engaged in, and continues to engage in, deceptive acts and practices because the Daisy Products are in fact made from ingredients derived from GMOs, which are not natural.

180.    Plaintiff and the Daisy New York Class members believed Daisy's representations that the Daisy Products they purchased were "Natural." Plaintiff and the Daisy New York Class members would not have purchased the Daisy Products at a premium price had they known the Daisy Products were not actually "Natural" because they were derived from GMOs.

181.    Plaintiff and the Daisy New York Class members were injured in fact and lost money as a result of Daisy's conduct of improperly describing the Daisy Products as "Natural." Plaintiff and the Daisy Nationwide Class members paid for "Natural" Daisy Products, but did not receive such products.

182.    The Daisy Products Plaintiff and the Daisy New York Class members received were worth less than the Daisy Products for which they paid. Plaintiff and the Daisy New York Class members paid a premium price on account of Daisy's misrepresentations that the Daisy Products were "Natural."

183.    By reason of the foregoing, Daisy's conduct, as alleged herein, constitutes deceptive

acts and practices in violation of New York General Business Law section 349, and Daisy is liable to Plaintiff and the Daisy New York Class members for the damages they have suffered as a result of Daisy's actions. The amount of such damages is to be determined at trial, but will not be less than $50.00. N.Y. GEN. BUS. LAW § 349(h).

184.    Plaintiff and the Daisy New York Class members seek to enjoin such unlawful, deceptive acts and practices described above. Each of the Daisy New York Class members will be irreparably harmed unless the Court enjoins Daisy's unlawful, deceptive actions in that Daisy will continue to falsely and misleadingly advertise the Daisy Products as "Natural."

185.    Plaintiff and the Daisy New York Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Daisy from continuing to disseminate its false and misleading statements, and other relief allowable under New York General Business Law section 349.

186.    Therefore, Plaintiff prays for relief as set forth below.

<u>CLAIM VII</u>

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,**
**N.Y. GEN. BUS. LAW § 349 *et seq.***
**New York General Business Law Section 350**
**Against Daisy Brand, LLC, on Behalf of the Daisy New York Class**

187.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

188.    Plaintiff brings this claim on behalf of the Daisy New York Class against Daisy for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349 *et seq.*

189.    New York General Business Law section 350 makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York unlawful. N.Y. GEN. BUS. LAW. § 350.

190.    Under section 350, the term "false advertising" means, in relevant part, "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a(1).

191.    As fully alleged above, by advertising, marketing, distributing, and/or selling the Daisy Products with claims that they were "Natural" to Plaintiff and the Daisy New York Class members, Daisy violated New York General Business Law section 350 by engaging in, and it continues to violate section 350 by continuing to engage in, false advertising concerning the composition of the Daisy Products, which are made from ingredients derived from GMOs, which are not natural.

192.    Plaintiff and the Daisy New York Class members believed Daisy's representations that the Daisy Products were "Natural." Plaintiff and the Daisy New York Class members would not have purchased the Daisy Products had they known the Daisy Products were not, in fact, "Natural"

because they contained ingredients derived from GMOs.

193.    Plaintiff and the Daisy New York Class members were injured in fact and lost money as a result of Daisy's conduct of improperly describing the Daisy Products as "Natural." Plaintiff and the Daisy Nationwide Class members paid for Daisy Products that were "Natural," but did not receive such products.

194.    The Daisy Products Plaintiff and the Daisy New York Class members received were worth less than the Daisy Products for which they paid. Plaintiff and the Daisy New York Class members paid a premium price on account of Daisy's misrepresentations that the Daisy Products were "Natural."

195.    Plaintiff and the Daisy New York Class members seek to enjoin such unlawful acts and practices as described above. Each of the Daisy New York Class members will be irreparably harmed unless the Court enjoins Daisy's unlawful actions, in that Plaintiff and the Daisy New York Class members will continue to be unable to rely on Daisy's representations that the Daisy Products are "Natural."

196.    Plaintiff and the Daisy New York Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Daisy from continuing to disseminate its false and misleading statements, and other relief allowable under New York General Business Law section 350.

197.    Therefore, Plaintiff prays for relief as set forth below.

## CLAIM VIII

**Breach of Express Warranty**
**Under the Laws of Each State in the United States and the District of Columbia**
**Against Daisy Brand, LLC, on Behalf of the Daisy Nationwide Class**

198.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

199.   Plaintiff brings this claim on behalf of the Daisy Nationwide Class against Daisy for breach of express warranty under the laws of each State in the United States and the District of Columbia.

200.   Plaintiff and the Daisy Nationwide Class members each formed a contract with Daisy at the time they purchased the Daisy Products.

201.   As part of each contract, Daisy represented that the Daisy Products were "Natural."

202.   Daisy's representations that the Daisy Products were "Natural" constituted express warranties and became part of the basis of the bargain between Plaintiff and the Daisy Nationwide Class members, on the one hand, and Daisy, on the other.

203.   Daisy represented that the Daisy Products were "Natural" to induce Plaintiff and the Daisy Nationwide Class members to purchase the Daisy Products.

204.   Plaintiff and the Daisy Nationwide Class members relied on Daisy's representations that the Daisy Products were "Natural" in purchasing the Daisy Products.

205.   Plaintiff and the Daisy Nationwide Class members have performed all conditions precedent to Daisy's liability under the above-referenced contracts when they purchased the Daisy Products for their ordinary purposes.

206.   Daisy breached its express warranties about the Daisy Products because the Daisy

Products contain ingredients derived from GMOs and are, thus, not "Natural."

207. Daisy breached the following state warranty laws:

a. ALA. CODE § 7-2-313 (Alabama);

b. ALASKA STAT. ANN. § 45.02.313 (Alaska);

c. ARIZ. REV. STAT. ANN. § 47-2313 (Arizona);

d. ARK. CODE ANN. § 4-2-313 (Arkansas);

e. CAL. COM. CODE § 2313 (California);

f. COLO. REV. STAT. ANN. § 4-2-313 (Colorado);

g. CONN. GEN. STAT. ANN. § 42a-2-313 (Connecticut);

h. DEL. CODE ANN. tit. 6, § 2-313 (Delaware);

i. D.C. CODE ANN. § 28:2-313 (District of Columbia);

j. FLA. STAT. ANN. § 672.313 (Florida);

k. GA. CODE ANN. § 11-2-313 (Georgia);

l. HAW. REV. STAT. ANN. § 490:2-313 (Hawai'i);

m. IDAHO CODE ANN. § 28-2-313 (Idaho);

n. 810 ILL. COMP. STAT. ANN. 5/2-313 (Illinois);

o. IND. CODE ANN. § 26-1-2-313 (Indiana);

p. IOWA CODE ANN. § 554.2313 (Iowa);

q. KAN. STAT. ANN. § 84-2-313 (Kansas);

r. KY. REV. STAT. ANN. § 355.2-313 (Kentucky);

s. LA. CIV. CODE ANN. art. 2520 (Louisiana);

t. ME. REV. STAT. ANN. tit. 11, § 2-313 (Maine);

u. MD. CODE ANN., COM. LAW § 2-313 (Maryland);

v.      MASS. GEN. LAWS ANN. ch. 106, § 2-313 (Massachusetts);

w.      MICH. COMP. LAWS ANN. § 440.2313 (Michigan);

x.      MINN. STAT. ANN. § 336.2-313 (Minnesota);

y.      MISS. CODE. ANN. § 75-2-313 (Mississippi);

z.      MO. ANN. STAT. § 400.2-313 (Missouri);

aa.     MONT. CODE ANN. § 30-2-313 (Montana);

bb.     NEB. REV. STAT. ANN. § UCC § 2-313 (Nebraska);

cc.     NEV. REV. STAT. ANN. § 104.2313 (Nebraska);

dd.     N.H. REV. STAT. ANN. § 382-A:2-313 (New Hampshire);

ee.     N.J. STAT. ANN. § 12A:2-313 (New Jersey);

ff.     N.M. STAT. ANN. § 55-2-313 (New Mexico);

gg.     N.Y. U.C.C. Law § 2-313 (New York);

hh.     N.C. GEN. STAT. ANN. § 25-2-313 (North Carolina);

ii.     N.D. CENT. CODE ANN. § 41-02-30 (North Dakota);

jj.     OHIO REV. CODE ANN. § 1302.26 (Ohio);

kk.     OKLA. STAT. ANN. tit. 12A, § 2-313 (Oklahoma);

ll.     OR. REV. STAT. ANN. § 72.3130 (Oregon);

mm.     13 PA. STAT. AND CONS. STAT. ANN. § 2313 (Pennsylvania);

nn.     6A R.I. GEN. LAWS ANN. § 6A-2-313 (Rhode Island);

oo.     S.C. CODE ANN. § 36-2-313 (South Carolina);

pp.     S.D. CODIFIED LAWS § 57A-2-313 (South Dakota);

qq.     TENN. CODE ANN. § 47-2-313 (Tennessee);

rr.     TEX. BUS. & COM. CODE ANN. § 2.313 (Texas);

ss.    UTAH CODE ANN. § 70A-2-313 (Utah);

tt.    VT. STAT. ANN. tit. 9A, § 2-313 (Vermont);

uu.    VA. CODE ANN. § 59.1-504.2 (Virginia);

vv.    WASH. REV. CODE ANN. § 62A.2-313 (Washington);

ww.    W. VA. CODE ANN. § 46-2-313 (West Virginia);

xx.    WIS. STAT. ANN. § 402.313 (Wisconsin); and

yy.    WYO. STAT. ANN. § 34.1-2-313 (Wyoming).

208.    As a result of Daisy's breaches of express warranties, Plaintiff and the Daisy Nationwide Class members were damaged in the amount of the purchase price and/or a premium they paid for the Daisy Products, in an aggregate amount that Plaintiff will prove at trial.

209.    Within a reasonable time after Plaintiff knew or should have known of Daisy's breaches of express warranties, Plaintiff, individually and on behalf of the Daisy Nationwide Class members, placed Daisy on notice thereof.

210.    Therefore, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Kraft Classes and members of the Daisy Classes respectfully requests that the Court enter an Order:

A.    certifying the Kraft Classes pursuant to Federal Rule of Civil Procedure 23 and adjudging Plaintiff and his counsel adequate class representatives;

B.    certifying the Daisy Classes pursuant to Rule 23 and adjudging Plaintiff and his counsel adequate class representatives;

C.    declaring Kraft financially responsible for notifying the Kraft Classes members of the pendency of this suit;

D.      declaring Daisy financially responsible for notifying the Daisy Classes members of the pendency of this suit;

E.      requiring Defendants to pay Plaintiff, the Kraft Classes members, and the Daisy Classes members economic, monetary, consequential, compensatory, or statutory damages, whichever is greater, and, if Plaintiff proves Defendants' conduct was willful, awarding Plaintiff, the Kraft Classes members, and the Daisy Classes members exemplary damages to the extent to which the law provides;

F.      awarding restitution and disgorgement of all monies Defendants acquired by means of any act or practice this Court declares was wrongful, or other appropriate remedy in equity, to Plaintiff, the Kraft Classes members, and the Daisy Classes members;

G.      awarding declaratory and injunctive relief as the law and equity permit, including: enjoining Defendants from continuing the unlawful practices set forth above; directing Defendants to rectify or cease their deceptive and misleading marketing campaigns; and directing Defendants to disgorge all monies Defendants acquired by means of any act or practice this Court declares was wrongful;

H.      awarding Plaintiff, individually and on behalf of the Kraft Classes members and the Daisy Classes members, his expenses and costs of suit, including reasonable attorneys' fees and reimbursement of reasonable expenses to the extent to which the law provides;

I.      awarding to Plaintiff, individually and on behalf of the Kraft Classes members and the Daisy Classes members, pre- and post-judgment interest to the extent the law allows; and

J.      for such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all claims so triable.

Date: August 17, 2016                    Respectfully submitted,

**REESE LLP**

By: _/s/ Michael R. Reese_____
    Michael R. Reese
    *mreese@reesellp.com*
    George V. Granade
    *ggranade@reesellp.com*
    100 West 93rd Street, 16th Floor
    New York, New York  10025
    Telephone: (212) 643-0500
    Facsimile: (212) 253-4272

    **HALUNEN LAW**
    Melissa W. Wolchansky
    *wolchansky@halunenlaw.com*
    Amy E. Boyle
    *boyle@halunenlaw.com*
    Charles D. Moore
    *moore@halunenlaw.com*
    1650 IDS Center
    80 South Eighth Street
    Minneapolis, Minnesota  55402
    Telephone: (612) 605-4098
    Facsimile: (612) 605-4099

    *Counsel for Plaintiff and the Proposed Class*